1
2
3
4
5
6
7
8              UNITED STATES DISTRICT COURT

9           FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   MARK HERNANDEZ,                        No.  2:14-cv-1857-MCE-EFB P

12              Petitioner,

13        vs.

14   SCOTT FRAUENHEIM, Warden,              FINDINGS AND RECOMMENDATIONS

15              Respondent.

16

17        Petitioner is a state prisoner proceeding through counsel with a petition for a writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254.  He challenges a judgment of conviction entered

19   against him on June 8, 2009, in the Sacramento County Superior Court on charges of second

20   degree murder and attempted murder.  He seeks federal habeas relief on the grounds that jury

21   instruction error violated his right to due process and his trial counsel rendered ineffective

22   assistance.  Upon careful consideration of the record and the applicable law, it is recommended

23   that petitioner's application for habeas corpus relief be denied.

24   **I. Background**

25        In its unpublished memorandum and opinion affirming petitioner's judgment of

26   conviction on appeal, the California Court of Appeal for the Third Appellate District provided the

27   following factual summary:

28   /////

                                            1

A jury convicted defendants J. Douglas Halford and Mark Hernandez of the second degree murder of a homeless man, Michael Wentworth, and the attempted murder of the decedent's homeless friend, Randy Terrell. Terrell taunted and threatened defendants for harassing Danny "Old Man Dan" Rasmussen, his 62–year–old homeless neighbor, and defendants, believing Terrell was another man who had beaten their 56–year–old diabetic friend and mentor, Danny Hughes, pursued Terrell and a fight ensued. The jury rejected defendants' claims of self-defense. On appeal, both defendants assert instructional error. We affirm.

**FACTS**

**The Setting.** Many homeless people live in close proximity to Loaves and Fishes, an organization that provides coffee and pastries at 7:00 a.m., a place to shower, and lunch for up to 900 people beginning at 11:30 a.m. every weekday. All of the homeless who were either victims or witnesses in this case gather at Loaves and Fishes. They live under trees and shrubs along the river, up on the levee, and in an open clearing they call "the snake pit." They eat together, sleep together, drink together, share drugs, and take care of one another. Without facilities, they use what they call "the shitter," but some of the homeless also urinate on their neighbors' properties.

Something of a Renaissance man, Danny Hughes owns a home very near the homeless encampments by the river. He had been a professional musician as well as an operating engineer, and he earned six first-place medals at the California State Fair for his cookies. He treasured the guitar he had owned for 40 years like a child. But he was in poor health after using methamphetamine for 40 years, and as a diabetic, he needed to adhere to a strict diet and insulin regimen. Although he installed a fence with a locked gate to secure the perimeter of his property, Hughes displayed a tolerant approach to his homeless neighbors. His more immediate and pressing problem was his old friend, Tommy Duke.

**The Two Dans.** Danny Hughes had been a friend of Tommy Duke for many years. But Duke became very violent when he drank, which he did with some regularity. On one occasion, Duke used Hughes's treasured guitar to smash Hughes's drum set. Duke then attacked Hughes, and Hughes believed Duke was trying to kill him. Duke returned many times, leading Hughes to repeatedly call 911. Eventually, defendant Mark Hernandez moved in with Hughes to protect him and to help him monitor his diet and insulin. Sixty-five-year-old J. Douglas Halford, another friend of Hughes, was a houseguest staying with Hernandez and Hughes at the time of the events leading up to the alleged crimes.

In late April 2008 Tommy Duke tore down Hughes's fence, entered his house, and threatened to kill him. Hughes called Hernandez and Halford for assistance. They escorted Duke out the front gate and instructed him not to return. En route, Halford grabbed Duke by the collar, pointed a big knife at his eye, and said, "'The only

2

reason your fucking eye is not disappearing and your life is [sic ] disappearing is because of that daughter that you have.'"

On the morning of April 30, 2008, Halford's routine morning trip to Starbucks was frustrated by his encounter with Danny Rasmussen, who had relocated some of his belongings from under a mulberry tree and placed them in a shopping cart in front of Hughes's gate. Rasmussen angered Halford.  He threatened Rasmussen with a knife.  Hernandez was more conciliatory.  Fearful of the knife, Rasmussen grabbed what belongings he could and ran away.  He testified someone kicked him and someone shouted, "'If you ever come back, I'll fuck you up.'"

Frazzled from his encounter with defendants, Rasmussen, that morning over coffee, told several of his friends and acquaintances what had happened.  Incensed, Randy Terrell, a 200 pound, physically imposing, 31–year–old homeless man, was determined to avenge Rasmussen.  Tragically, Randy Terrell looked like Tommy Duke.

**Witnesses to the Stabbings.**  The prosecution's witnesses provide a vivid composite of human suffering.  The percipient witnesses' afflictions are many: physical and mental disabilities, addiction, poverty, joblessness, and homelessness.  Defendants argued vociferously that the witnesses either could not see, could not remember what they saw, and could not be trusted.  From defendants' view, the witnesses made miserable historians.

So, for example, both victims tested positive for methamphetamine in their systems, a drug that makes the user feel empowered, oblivious to pain, and easily agitated.  Randy Terrell testified he drinks as many Hurricane High Gravity 40–ounce beers as he can earn by turning in recyclables for money every day.  The alcohol intensifies his anger.  On the day of the stabbings, he was pretty drunk, and at trial his memory of what transpired was "very blurry." He also uses methamphetamine and smokes marijuana.

Robert Otis had been homeless for 14 years at the time of the trial. Called "Bug Eye" because his left eye was disfigured and he could not see out of it, Otis's remaining vision was very blurry.

Patrick Hill completed a rehabilitation program a few months before the stabbing.  Michael Wentworth, the decedent, was known as "Gremlin," jumped around a lot, and, at 114 pounds, he too drank and used drugs.  He had been released from the Sacramento County Jail that very morning.  Wentworth's good friend and benefactor, Patrick Hill, went to the river to look for him, and brought a case of beer to share with Wentworth and a group of people he knew would be there.  Hill drank two or three beers, Wentworth drank some, and they shared the rest with their friends.

Thus, the jury was well-acquainted with the witnesses' shortcomings.  Flawed or not, the percipient witnesses testified to what they saw and heard, and it was the jury's prerogative, not ours, to assess their credibility and their ability to perceive, recall, and

recount what happened on the evening of April 30. We provide a brief synopsis of the key witnesses' accounts of what happened.

According to Hughes, someone who initially appeared to be Tommy Duke but who was actually Randy Terrell rode a bicycle in circles in front of Hughes's house around noon, walked his back-fence line about 3:00 in the afternoon, and again circled in front of the house on a bicycle around 6:00 p.m. He had a knife in his hand and shouted, "Where's the mother fucker that beat up my old man homeboy? I got a knife. I'm going to stick him." Hughes testified the knife looked like a cheap facsimile of a Buck knife with a rubber handle. Hughes heard Halford respond, "I'll deal with the motherfucker," and he saw both defendants go out the front gate and follow Terrell up a hill to the levee.

Terrell candidly admitted he was extremely angry about how Rasmussen had been treated. He had nursed his anger with his Hurricane High Gravities, was "pretty buzzed," and returned to Hughes's house around 6:00 p.m. to start a fight. He taunted the occupants with threats like, "You guys have a problem picking on old men, come out here and pick on me." According to Terrell, Hernandez came out of the house, instructed Terrell to "[w]ait a minute," and then went back in the house. Fearing Hernandez was getting a weapon, Terrell left.

Terrell joined his friends Otis and "Bandanna" in the snake pit. After a minute or two he walked over to Hill and Wentworth and had a short conversation before returning to Otis and Bandanna. A few seconds after that, defendants came up over the hill and approached him. Otis handed Terrell a knife. As he told the jury, he was angry and confronted defendants, asking, "Why you guys got to mess with an old man?" He noticed that Halford was carrying a Buck knife at his side.

Terrell's friends Hill and Wentworth immediately came to his aid. Wentworth was hopping around like a "leprechaun" or "a Mexican jumping bean," trying to diffuse the situation. As Hernandez, Wentworth, and Hill went off in one direction, Halford and Terrell started swinging knives at each other. Terrell testified that Halford stabbed him in his left upper arm. He did not see what happened to Wentworth.

Patrick Hill was urinating in the "shitter" and talking on his cell phone when Wentworth summoned him to come and help defend Terrell. He was still trying to zip up his pants as Wentworth ran up the hill. Hill saw Halford carrying a stick over his shoulder. As they met, Halford said to Terrell, "You jumped our friend and we're gonna kill you." According to Hill, Terrell did not have a knife.

Halford, according to Hill, started swinging the stick. Hill, still on the phone and continuing to zip up his pants, told Wentworth, "[W]e're not gonna let them jump him. We can't let that happen." Wentworth jumped in front of Terrell and knocked Halford to the ground. Hernandez pulled out two knives and gave one to Halford.

4

Hill backed Hernandez up to the bike trail.  He removed a beer he had stored in his back pocket and threw it at Hernandez but missed.

Turning, Hill saw Halford and Wentworth swinging at each other.  As he started to run, he saw that Wentworth was in trouble.  Terrell entered the fray.  Halford stabbed Wentworth in the arm, and as Wentworth stumbled backwards, Hernandez stabbed him in the back.  Halford stabbed him in the chest.  Halford and Hernandez then walked away.

Otis had been living in the same tree with Terrell at the time of the stabbings.  He saw Terrell come up over the hill, followed shortly by both Halford and Hernandez.  Otis, like Terrell and Hill, testified that Halford was carrying a big stick.  He, too, heard Halford say, "I'm going to kill you."  He confirmed he gave Terrell a knife and a scuffle ensued.  Halford swung at Terrell, Wentworth jumped in, and then he fell.   After he got up, he began fighting with Hernandez.  Otis saw Hernandez make a thrusting or stabbing motion toward Wentworth's back.  Halford and Hernandez then walked away.

Others gave similar accounts, although some of the specific details differed.  Shawn Medlock and his fiancée, Elizabeth Chrisman, were also homeless.  They both saw Hernandez with a stick and a knife.  Medlock saw Hill talking on his cell phone, Terrell walking toward Hernandez, and Hernandez and Halford both holding knives.  He saw Halford stabbing Wentworth and stating, "You mother fucker, I'm gonna kick your ass.  You mother fucker, fucker, fucker."  Terrell, who himself had been stabbed, asked Medlock and Chrisman for a knife.  Wentworth was trying to get away, but he collapsed.  They tried to administer first aid, but Wentworth died of a stab wound to his chest.

Terrell, Hill, Hill's girlfriend, and Hughes all called 911 to report the stabbing.  Hill followed defendants down the hill.  Hernandez had a wound on his arm and said someone had thrown a beer at him.  Police officers arrived at Hughes's house.  Halford told the officers, "These homeless guys are the ones that should be in handcuffs.  I've been getting into it with those guys.  They come down to the yard at 1629 Basler and piss on the yard.  Today I went up to the levee to talk with them and ask them to stop.  As soon as I got up there, these guys just started coming at me.  They had knives and bottles and I thought they were gonna hurt me.  I had a knife with me.  I might have nicked one with the knife."  When asked if he had any weapons, Halford produced a small folding knife from his right front pocket.  The blade was too short to have inflicted the fatal wound to Wentworth's chest, but it could have caused a second wound in his right upper back.

Hernandez told a neighbor who visited him in jail that he thought the person they were following up on the levee was Tommy Duke.  Halford had injuries to his left and right middle fingers, and Hernandez had injuries to both knees and his left middle finger.

*People v. Halford, et al.*, No. C062401, 2013 WL 285580, at *4 (Cal. Ct. App. Jan. 23, 2013).

5

1  **II.  Standards of Review Applicable to Habeas Corpus Claims**

2    An application for a writ of habeas corpus by a person in custody under a judgment of a

3  state court can be granted only for violations of the Constitution or laws of the United States.  28

4  U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or

5  application of state law.  *See Wilson v. Corcoran*, 562 U.S. 1, 5 (2010); *Estelle v. McGuire*, 502

6  U.S. 62, 67-68 (1991); *Park v. California*, 202 F.3d 1146, 1149 (9th Cir. 2000).

7    Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas

8  corpus relief:

9
10     An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

11

12
13     (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

14
15     (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

16    For purposes of applying § 2254(d)(1), "clearly established federal law" consists of

17  holdings of the United States Supreme Court at the time of the last reasoned state court decision.

18  *Thompson v. Runnels*, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing *Greene v. Fisher*, ___ U.S.

19  ___, 132 S.Ct. 38 (2011); *Stanley v. Cullen*, 633 F.3d 852, 859 (9th Cir. 2011) (citing *Williams v.*

20  *Taylor*, 529 U.S. 362, 405-06 (2000)).  Circuit court precedent "may be persuasive in determining

21  what law is clearly established and whether a state court applied that law unreasonably."  *Stanley*,

22  633 F.3d at 859 (quoting *Maxwell v. Roe*, 606 F.3d 561, 567 (9th Cir. 2010)).  However, circuit

23  precedent may not be "used to refine or sharpen a general principle of Supreme Court

24  jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced."  *Marshall*

25  *v. Rodgers*, 133 S. Ct. 1446, 1450 (2013) (citing *Parker v. Matthews*, 132 S. Ct. 2148, 2155

26  (2012) (per curiam)).  Nor may it be used to "determine whether a particular rule of law is so

27  widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court,

28  be accepted as correct.  *Id.*  Further, where courts of appeals have diverged in their treatment of

6

1    an issue, it cannot be said that there is "clearly established Federal law" governing that issue.

2    *Carey v. Musladin*, 549 U.S. 70, 77 (2006).

3        A state court decision is "contrary to" clearly established federal law if it applies a rule

4    contradicting a holding of the Supreme Court or reaches a result different from Supreme Court

5    precedent on "materially indistinguishable" facts. *Price v. Vincent*, 538 U.S. 634, 640 (2003).

6    Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the

7    writ if the state court identifies the correct governing legal principle from the Supreme Court's

8    decisions, but unreasonably applies that principle to the facts of the prisoner's case.[1] *Lockyer v.*

9    *Andrade*, 538 U.S. 63, 75 (2003); *Williams*, 529 U.S. at 413; *Chia v. Cambra*, 360 F.3d 997, 1002

10    (9th Cir. 2004).  In this regard, a federal habeas court "may not issue the writ simply because that

11    court concludes in its independent judgment that the relevant state-court decision applied clearly

12    established federal law erroneously or incorrectly.  Rather, that application must also be

13    unreasonable." *Williams*, 529 U.S. at 412.  *See also Schriro v. Landrigan*, 550 U.S. 465, 473

14    (2007); *Lockyer*, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its independent

15    review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'").

16    "A state court's determination that a claim lacks merit precludes federal habeas relief so long as

17    'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v.*

18    *Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

19    Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner

20    must show that the state court's ruling on the claim being presented in federal court was so

21    lacking in justification that there was an error well understood and comprehended in existing law

22    beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

23        If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing

24    court must conduct a de novo review of a habeas petitioner's claims. *Delgadillo v. Woodford*,

25    527 F.3d 919, 925 (9th Cir. 2008); *see also Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008)

---

26

27      [1]  Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding."  *Stanley*, 633 F.3d at 859 (quoting *Davis v. Woodford*,

28    384 F.3d 628, 638 (9th Cir. 2004)).

1   (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of §

2   2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering

3   de novo the constitutional issues raised.").

4          The court looks to the last reasoned state court decision as the basis for the state court

5   judgment. *Stanley*, 633 F.3d at 859; *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004).  If

6   the last reasoned state court decision adopts or substantially incorporates the reasoning from a

7   previous state court decision, this court may consider both decisions to ascertain the reasoning of

8   the last decision. *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  "When

9   a federal claim has been presented to a state court and the state court has denied relief, it may be

10  presumed that the state court adjudicated the claim on the merits in the absence of any indication

11  or state-law procedural principles to the contrary." *Richter*, 562 U.S. at 99.  This presumption

12  may be overcome by a showing "there is reason to think some other explanation for the state

13  court's decision is more likely." *Id.* at 785 (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)).

14  Similarly, when a state court decision on a petitioner's claims rejects some claims but does not

15  expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that

16  the federal claim was adjudicated on the merits. *Johnson v. Williams*, ___ U.S. ___, ___, 133

17  S.Ct. 1088, 1091 (2013).

18         Where the state court reaches a decision on the merits but provides no reasoning to

19  support its conclusion, a federal habeas court independently reviews the record to determine

20  whether habeas corpus relief is available under § 2254(d).  *Stanley*, 633 F.3d at 860; *Himes v.*

21  *Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).   "Independent review of the record is not de novo

22  review of the constitutional issue, but rather, the only method by which we can determine whether

23  a silent state court decision is objectively unreasonable." *Himes*, 336 F.3d at 853.  Where no

24  reasoned decision is available, the habeas petitioner still has the burden of "showing there was no

25  reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98.

26         A summary denial is presumed to be a denial on the merits of the petitioner's claims.

27  *Stancle v. Clay*, 692 F.3d 948, 957 & n. 3 (9th Cir. 2012).  While the federal court cannot analyze

28  just what the state court did when it issued a summary denial, the federal court must review the

1    state court record to determine whether there was any "reasonable basis for the state court to deny

2    relief." *Richter*, 562 U.S. at 98.  This court "must determine what arguments or theories ... could

3    have supported, the state court's decision; and then it must ask whether it is possible fairminded

4    jurists could disagree that those arguments or theories are inconsistent with the holding in a prior

5    decision of [the Supreme] Court." *Id.* at 102.  The petitioner bears "the burden to demonstrate

6    that 'there was no reasonable basis for the state court to deny relief.'" *Walker v. Martel*, 709 F.3d

7    925, 939 (9th Cir. 2013) (quoting *Richter*, 562 U.S. at 98).

8        When it is clear, however, that a state court has not reached the merits of a petitioner's

9    claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

10   habeas court must review the claim de novo.  *Stanley*, 633 F.3d at 860; *Reynoso v. Giurbino*, 462

11   F.3d 1099, 1109 (9th Cir. 2006); *Nulph v. Cook*, 333 F.3d 1052, 1056 (9th Cir. 2003).

12   **III.  Petitioner's Claims**

13       Petitioner raises four claims of jury instruction error.  After setting forth the applicable

14   legal principles, the court will address these claims in turn below.

15       **A.  Applicable Legal Standards**

16       In general, a challenge to jury instructions does not state a federal constitutional claim.

17   *Engle v. Isaac*, 456 U.S. 107, 119 (1982)); *Gutierrez v. Griggs*, 695 F.2d 1195, 1197 (9th Cir.

18   1983).  In order to warrant federal habeas relief, a challenged jury instruction "cannot be merely

19   'undesirable, erroneous, or even "universally condemned,"' but must violate some due process

20   right guaranteed by the fourteenth amendment." *Cupp v. Naughten*, 414 U.S. 141, 146 (1973).

21   The appropriate inquiry "is whether the ailing instruction . . . so infected the entire trial that the

22   resulting conviction violates due process." *Middleton v. McNeil*, 541 U.S. 433, 437 (2004)

23   (quoting *Estelle v. McGuire*, 502 U.S. 62, 72 (1991)).

24       "[A] single instruction to a jury may not be judged in artificial isolation, but must be

25   viewed in the context of the overall charge." *Id.*  (quoting *Boyde v. California*, 494 U.S. 370, 378

26   (1990)) (internal quotation marks omitted).  "Instructions that contain errors of state law may not

27   form the basis for federal habeas relief." *Gilmore v. Taylor*, 508 U.S. 333, 342 (1993).  "If the

28   charge as a whole is ambiguous, the question is whether there is a 'reasonable likelihood that the

1    jury has applied the challenged instruction in a way' that violates the Constitution." *Dixon v.*

2    *Williams*, 750 F.3d 1027, 1033 (9th Cir. 2014), *as amended on denial of reh'g and reh'g en banc*

3    (June 11, 2014) (citations omitted). The Supreme Court has "defined the category of infractions

4    that violate 'fundamental fairness' very narrowly." *Dowling v. United States*, 493 U.S. 342, 352

5    (1990).

6        Petitioner is entitled to relief on his jury instruction claims only if he can show prejudice.

7    *Dixon*, 750 F.3d at 1034. Prejudice is shown for purposes of habeas relief if the trial error had a

8    "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v.*

9    *Abrahamson*, 507 U.S. 619, 637 (1993). Mere speculation that the defendant was prejudiced by

10    trial error is insufficient; the reviewing court "must find that the defendant was actually

11    prejudiced by the error." *Calderon v. Coleman*, 525 U.S. 141, 146 (1998) (per curiam ). A

12    reviewing court may grant habeas relief only if it is "'in grave doubt as to the harmlessness of an

13    error.'" *Id.* (quoting *O'Neal v. McAninch*, 513 U.S. 432, 437 (1995)). United States Supreme

14    Court habeas precedent "places an 'especially heavy' burden on a defendant who . . . seeks to

15    show constitutional error from a jury instruction that quotes a state statute." *Waddington v.*

16    *Sarausad*, 555 U.S. 179, 190 (2009) (quoting *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977)).

17        **B. Jury Instructions on Self-Defense**

18        In his first two grounds for relief, petitioner claims that the trial court violated his right to

19    due process and lightened the prosecution's burden of proof on the issue of self-defense when it

20    instructed the jury with CALCRIM Nos. 3471 and 3472. ECF No. 1 at 10-14.[2] Petitioner raised

21    these claims on direct appeal and in a petition for review filed in the California Supreme Court.

22    Resp't's Lodg. Docs. 15, 30. In the last reasoned decision, the California Court of Appeal

23    explained the background to these claims and its ruling thereon, as follows:

24
25
26

> Defendants both challenge two standardized instructions the court
> gave the jury explaining various nuances of self-defense. The court
> instructed the jury that: "A person does not have the right to self-
> defense if he provokes a fight or quarrel with the intent to create an
> excuse to use force." (CALCRIM No. 3472.) The court also

27

28    [2]   Page number citations such as this one are to the page numbers reflected on the court's
CM/ECF system and not to page numbers assigned by the parties.

instructed the jury: "A person who engages in mutual combat or who is the initial aggressor has a right to self-defense only if:

"1. He actually and in good faith tries to stop fighting;

"2. He indicates, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that he wants to stop fighting and that he has stopped fighting;

"And

"3. He gives his opponent a chance to stop fighting.

"If a person meets these requirements, he then has a right to self-defense if the opponent continues to fight.

"A fight is mutual combat when it began or continued by mutual consent or agreement.  That agreement may be expressly stated or implied and must occur before the claim to self defense arose.

"If you decide that the defendant started the fight using non-deadly force and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try to stop fighting."  (CALCRIM No. 3471.)

Defendants, presenting their version of the facts, argue there was not substantial evidence to warrant the instructions.  The question is not, however, whether there is substantial evidence to support defendants' version of the facts that justified their use of deadly force, but whether there is substantial evidence of the alternative narratives presented by the prosecution and embodied in the challenged instructions that they either provoked the fight or engaged in mutual combat.

As to the propriety of delivering CALCRIM No. 3472, defendants rely on a case decided in the late 19th century.  In *People v. Conkling* (1896) 111 Cal. 616 (*Conkling*), the decedent had blocked off a road that ran across his leased land.  Defendant, armed with a rifle, tore down the fence and traveled the road to the post office.  On his return, he encountered the victim.  (*Id.* at pp. 619–620.)  There was no evidence whether the defendant or the victim was the initial aggressor.  The defendant admitted shooting the decedent but claimed self-defense.  (*Id.* at pp. 620–621.)

It is true the jury instruction given in *Conkling* suggested that the defendant might have forfeited his right to defend himself by his conduct preceding the killing.  Reversing on this ground, among others, the Supreme Court explained: "[The instruction] says in effect that, if the necessity for the killing arose by the fault of defendant, then the killing was not done in self-defense; and, again, it says if the danger which surrounded defendant was one brought upon himself by his own misconduct he cannot defend himself against it.  Aside from any question as to the immediate cause which at the time of the killing precipitated the affray, this language

11

of the instruction is broad enough to justify the jury in believing that it was such a fault or misconduct upon the part of the defendant, in attempting to travel this road under existing circumstances, as to deprive him of the right of self-defense if attacked by deceased at the point where the road was obstructed. Such, certainly, is not the law, and neither court nor counsel for the people would so contend." (*Conkling, supra*, 111 Cal. at pp. 625–626.)

Defendants insist that they, like Conkling, retained the right to defend themselves when they left the safety of Hughes's house and pursued Terrell up on the levee. The Attorney General does not suggest otherwise. Defendants contend there were no facts to support the instruction, and the error was exacerbated by the prosecutor's liberal references to the instruction during his closing argument. Indeed, defendants accuse the prosecutor of using the concept embodied by the instruction to divert the jury's attention from the real issue of deciding whether self-defense was reasonable and necessary during the altercation on the levee.

But to accept defendants' argument is to ignore half the case. The jury was certainly free to view defendants' conduct as a reasonable attempt to peacefully settle a long-simmering dispute with Tommy Duke and thus to reject the prosecution's theory that when defendants armed themselves with a stick and knives and pursued Terrell, whom they believed to be Duke, up the levee and announced their intent to kill him, they had provoked the fight to create an excuse to use force. But the prosecution's evidence of defendants' conduct preceding and during the fight was more than ample to justify the instruction and to give the jury the guidance it required to apply the many aspects of the right to self-defense, including the concept of a contrived self-defense. If, as the prosecution's evidence suggested, defendants were the first assailants, never withdrew from the affray, and, as the aggressors, were responsible for the fight, then the jury could infer that they intended to create an excuse to use force and therefore they were not entitled to the benefit of self-defense. CALCRIM No. 3472, when read together with the other instructions on self-defense, embodies those principles and the court properly delivered it to the jury.

Nevertheless, defendants insist CALCRIM No. 3472 should not have been given to the jury in this case because there was insufficient evidence of a specific intent to contrive a pretext for self-defense. They insist there must be evidence their actions in arming themselves and threatening the victims must have been a "premeditated" and "conscious" design to create the justification for the use of self-defense. But we can find no authority that the intent described in CALCRIM No. 3472 requires premeditation.

CALCRIM No. 3472 must be read in conjunction with all the other instructions on self-defense, as the jury was instructed in this case. The jury was also admonished to apply only those instructions that pertained to the facts as they determined them. So, for example, defendants did not forfeit their right to self-defense simply because

they initiated the fight, if the jury found that their nonlethal provocation was met with a lethal response. Certainly, as CALCRIM No. 3472 explicitly states, defendants must have intended to create an excuse to use force, but there is no need for the type of premeditation and calculation defendants suggest as a way to "manageably confine[ ]" the concept of contrivance.

Moreover, the evidence was sufficient to give the instruction. Defendants left the safety of their residence to pursue Terrell. Although Halford was to later explain they were just going up to the levee to talk to a few homeless people about "piss[ing]" on the yard, they armed themselves with knives and a stick. Halford announced that he was planning to "deal with the motherfucker" as he left the house well armed, although he later would claim that he and Hernandez were greeted at the levee by men threatening them with knives and bottles. When the police recovered a knife in his pocket, he explained that he "might have nicked" one of the men on the levee even though the evidence established the victim had in fact been stabbed in the chest to a depth of five and one-half inches by a knife that would have been much larger than the one recovered from his pocket.

It was the jury's prerogative to determine whether defendants' conduct in leaving the house, arming themselves, announcing their intention, pursuing Terrell up onto the levee, and, in Halford's case, offering excuses and explanations established an intent to create an excuse to use force. But there is sufficient evidence to support the judge's decision to give the instruction based on the inferences the jury could reasonably draw that they intended to set up a pretext for a need to use self-defense.

While there may be more conceptual landmines in CALCRIM No. 3471 around the notion of "mutual combat," the evidentiary basis for the instruction is far stronger than the meager showing defendants highlight in *People v. Ross* (2007) 155 Cal.App.4th 1033 (*Ross*). In *Ross*, the Court of Appeal had occasion to examine what mutual combat means, particularly because the court refused the jury's request for a definition of the phrase. We agree with the court that "[l]ike many legal phrases, 'mutual combat' has a dangerously vivid quality. The danger lies in the power of vivid language to mask ambiguity and even inaccuracy. [Fn. omitted.] Here the jury was told that participation in 'mutual combat' conditionally bars the participants from pleading self-defense if either is prosecuted for assaulting the other. [Fn. omitted.] The 'combat' element of this rule is clear enough, at least for present purposes. It suggests two (or more) persons fighting, whether by fencing with swords, having a go at fisticuffs, slashing at one another with switchblades, or facing off with six-guns on the dusty streets of fabled Dodge City. The trouble arises from 'mutual.' When, for these purposes, is combat 'mutual'? What distinguishes 'mutual' combat from combat in which one of the participants retains an unconditional right of self-defense?" (*Ross, supra*, 155 Cal.App.4th at pp. 1043–1044.)

Culled from a distinguished line of cases, the court held that "'mutual combat' means not merely a reciprocal exchange of blows but one pursuant to mutual intention, consent, or agreement preceding the initiation of hostilities."   (*Ross, supra*, 155 Cal.App.4th at p. 1045.)   One who voluntarily engages in mutual combat must attempt to withdraw from it before he is justified in killing an adversary to save himself.   "Mutual combat," as it relates to self-defense, is a fight "'begun or continued by mutual consent or agreement, express or implied. [Citations.]'"   (*Ibid.*)

Defendants contend there was no agreement to fight, and therefore the instruction should not have been given.   In *Ross*, the defendant had been invited by his friend to move into a trailer already occupied by the friend, his girlfriend, her four young children, and her mother.   (*Ross, supra*, 155 Cal.App.4th at pp. 1036–1037.)   The girlfriend was unhappy with the arrangement.   (*Id.* at p. 1037.)   Her friend, the victim, got into a shouting match with the defendant and told him, "'"Fuck you."'"   (*Ibid.*)   The defendant told her to watch her language around the children, and a heated exchange ensued, which lasted for several minutes.   (*Id.* at pp. 1037–1038.)   Ultimately, the defendant told the victim, "'"You sound like an old whore"'" or "'a fucking whore.'"   (*Id.* at p. 1038.)   She slapped him and then hit him again.   He struck back, although the witnesses gave different accounts of how hard and how many times the defendant struck the victim.   (*Id.* at pp. 1038–1039.)

On these facts, the court concluded, "We do not believe any reasonable juror faced with this evidence could conclude beyond a reasonable doubt that defendant and [the victim] at any time mutually agreed, consented, arranged, or intended to fight one another.   Instead the evidence strongly suggests that the parties exchanged contemptuous remarks until [the victim] lost her temper and slapped defendant, whereupon he punched her back.   [Fn. omitted.]   This is not 'mutual combat' as that term has been explicated in California precedents.   This does not mean that defendant was legally entitled to punch [the victim].   That was and remains a legitimate question for the jury.   But the answer must hinge on whether defendant responded with reasonable force to avert a threat of violence against his person.   There is no adequate basis here for a finding that defendant was at any time engaged in mutual combat with [the victim]."   (*Ross, supra*, 155 Cal.App.4th at p. 1054.)

Defendants urge us to apply the same logic here.   While the evidence of mutual combat may not be overwhelming, and, as we noted above, the phrase itself is plagued by a "dangerously vivid quality" masking ambiguity and inaccuracy, the course of events leading up to defendants' fight on the levee is of an entirely different nature than the spontaneous eruption of violence in *Ross*. There, a woman lost her temper and slapped the defendant, who had been crude and argumentative during their verbal sparring.   There is no indication that there was any advance warning a physical confrontation would erupt.   In short, there was no evidence of an express or implied agreement to engage in a mutual fight.

14

Certainly we must agree that defendants did not expressly agree to a fight with Terrell or anyone else on the levee.  But defendants ignore the evidence of an implied agreement.  Terrell appeared at Hughes's house throughout the day, riding in circles and taunting the occupants.  By 6:00 p.m., he was drunk; brandishing a knife, according to Hughes; and shouting, "Where's the mother fucker that beat up my old man homeboy?  I got a knife.  I'm going to stick him."   A reasonable juror could construe his remarks as an invitation to fight.

And defendants' responses suggest an acceptance of the offer. Hernandez yelled out, "Wait a minute," then went inside, possibly to arm himself.  Halford told Terrell, "I'm right here" or "Here I am."  Terrell fled, but defendants decided to pursue him.  Halford informed Hughes, "I'll deal with the mother fucker" as he went out the front gate and followed Terrell up the hill.

Thus, there was not, as in *Ross*, a sudden explosion of violence. This was a confrontation that had been building for hours, even days, in that defendants believed Terrell was Duke and Duke had been an ongoing problem for some time.   There was sufficient evidence they agreed to the pending fight, albeit with someone other than their intended opponent.

Moreover, there was also evidence that Terrell agreed to fight.  No one disputes that he antagonized defendants by circling in front of Hughes's house and threatening the occupants.  But once he left, the jury was confronted with the question of who became the aggressor and who had the right to exert lethal force.  Both sides offered their versions of what actually transpired on the hill.  It was up to the jury to decide questions of credibility and determine the thorny issues involving self-defense under the circumstances.  But given the fact that Terrell had taunted defendants, and defendants had taken their time to arm themselves and Halford expressed his intention to take care of that "mother fucker," there was sufficient evidence of the kind of mutuality *Ross* demands.  Far from a spontaneous eruption of violence by one person against another, here the defendants and their victim, Terrell, provoked and engaged in the violent confrontation that followed.

Finally, defendants argue that because CALCRIM No. 3471 fails to define "initial aggressor" it relieved the prosecution of the burden of proving each element of the charged offense, thereby violating the Sixth Amendment right to a jury trial and their right to due process.  (*Sullivan v. Louisiana* (1993) 508 U.S. 275 [124 L.Ed.2d 182].)  Even if there is an abstract possibility, regardless of how remote, that the failure to further define, refine, or explain the meaning of "initial aggressor" might confuse the jury and allow it to deny a defendant the right to self-defense, this is not the case. Based on all the evidence we have recited multiple times above, any instructional error was harmless beyond a reasonable doubt and did not contribute to the verdict.  (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705].)

/////

15

1
2
3
4
5
6

Defendants insist that verbal threats are not enough to make them the initial aggressors.  Nor, in their view, was arming themselves with knives and sticks.  But they would have us ignore context and presume the truth of their version of the facts.  The jury heard compelling evidence that Terrell had left their neighborhood before they initiated their campaign.  Although they were then in the safety of Hughes's home, Halford announced that he would deal with that "motherfucker," and he and Hernandez grabbed knives and a stick as they pursued Terrell up onto the levee.  The prosecutor argued, based on this evidence, that the jury could consider them the initial aggressors.

7
8
9
10
11

Once they arrived at the levee and confronted Terrell, Halford, in Hernandez's presence, again made his intention perfectly clear, stating that either "I" or "we" are "going to kill you."  Alternatively, the prosecutor suggested that defendants then became the initial aggressors.  In either case, the prosecutor's burden of proof was not diluted, and there is no likelihood the jury misinterpreted the instruction to apply in a way that violated defendants' constitutional rights to due process or a jury trial.

12
13
14
15
16
17
18
19
20

When read together, the self-defense instructions make clear that the right to self-defense ebbs and flows depending on who does what when.  CALCRIM No. 3471 focuses on two circumstances—mutual combat and initial aggressors—when an accused loses the right to self-defense unless he stops fighting and notifies the victim of his intent to withdraw.  Here there was compelling evidence that defendants achieved the role as "initial aggressors" and no reason to suspect the jurors were confused or misinformed about what these terms meant.  While defendants hypothesize the jury rejected their theories of self-defense based solely on their verbal threats or their well-justified decision to arm themselves, we conclude that the evidence, when considered in light of all the circumstances and the chronology of what defendants did and said to whom, and when they made those threats and used their weapons, inspires our confidence that any possible error in failing to define initial aggressor was harmless beyond a reasonable doubt.  CALCRIM No. 3471 was properly given under these circumstances.

21

*Halford*, 2013 WL 285580, at *4-8.

22

After a review of the relevant record, this court concludes that the giving of CALCRIM

23

No. 3471 and 3472 in the context of this case did not violate petitioner's right to due process.

24

Under the facts presented here, these two instructions did not "so infuse[ ] the trial with

25

unfairness as to deny due process of law."  *Lisenba v. California*, 314 U.S. 219, 228 (1941).  For

26

the detailed reasons set forth in the decision of the California Court of Appeal, the facts of this

27

case fairly support the giving of both jury instructions.  This is true even though those facts could

28

be interpreted in different ways by the prosecution and the defense.  There was ample evidence to

16

1    support the prosecution's theory that petitioner and Halford were, or became, "initial aggressors"

2    and mutual combatants.  Aside from petitioner's speculation, there is no evidence the jurors were

3    unclear about the meaning of the terms or that they employed them in an improper way.  Finally,

4    viewing the jury instructions as a whole, the state court's decision that any error in giving

5    CALCRIM Nos. 3471 and/or 3472 to petitioner's jury was harmless is not objectively

6    unreasonable.  Given petitioner's actions and the actions of co-defendant Halford, any possible

7    ambiguity in the terms "initial aggressor" or "mutual combat" contained in CALCRIM No. 3471

8    could not have had a "substantial and injurious effect or influence" in determining the jury verdict

9    in this case.  *Brecht*, 507 U.S. at 637.

10         The decision of the California Court of Appeal denying petitioner's first and second

11    claims for relief was not contrary to or an unreasonable application of federal law.  Certainly that

12    decision was not "so lacking in justification that there was an error well understood and

13    comprehended in existing law beyond any possibility for fair-minded disagreement."  *Richter*,

14    562 U.S. at 103.  Accordingly, petitioner is not entitled to federal habeas relief on these claims.

15         **C. Jury Instruction on Aider and Abettor**

16         In his third claim for relief, petitioner argues that the jury instructions given at his trial on

17    aiding and abetting violated his right to due process because they lightened the prosecution's

18    burden of proof to establish beyond a reasonable doubt that he harbored malice aforethought.

19    ECF No. 1 at 14-19.  Specifically, petitioner contends that the instruction failed to inform the

20    jurors that they were required to assess his mental state independently of the mental state of co-

21    defendant Halford in order to determine whether he committed the charged crimes.  *Id.* at 16.

22    Petitioner argues this instructional error was prejudicial because, unlike Halford, he did not have

23    "the state of mind consistent with malice aforethought as required for murder."  *Id.* at 18.

24    Therefore, according to petitioner, jury instructions which stated that petitioner was "equally

25    guilty" of the charged crimes allowed the jury to find him guilty even though he might not have

26    harbored the necessary mental state.

27         The California Court of Appeal denied this claim on procedural grounds and on the

28    merits.  The court reasoned as follows:

In *People v. McCoy* (2001) 25 Cal.4th 1111 (*McCoy*), the California Supreme Court unhinged the liability of an aider and abettor from that of a perpetrator in a sea change opinion that now allows a jury to find an aider and abettor guilty of a greater offense than the perpetrator.   Yet juries are routinely instructed that a person is equally guilty of the crime whether he or she committed it personally or aided and abetted the perpetrator who committed it. (CALCRIM No. 400.)   In the aftermath of *McCoy*, the Courts of Appeal in *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1163 (*Samaniego*) and *People v. Nero* (2010) 181 Cal.App.4th 504, 514 (*Nero*) found the phrase "equally guilty" misleading.  Moreover, in *Nero* the court held that an aider and abettor can be found guilty of a crime lesser than the crime committed by the perpetrator.  (*Id.* at p. 514.)

Because, according to *Nero*, Hernandez may have been guilty of a lesser crime than the perpetrator Halford, he contends the court misled the jurors by instructing them in the language of CALCRIM No. 400 that if the jury found he was an aider and abettor, then he was "equally guilty" of the crimes Halford committed.   He reiterates the many ways in which the jury could have found him much less culpable than Halford, including his solicitous attitude toward Rasmussen in front of Hughes's house, the consistent testimony that he played a secondary role and did not shout threats or profanities before or during the altercation, and the inconsistent testimony as to whether he actually stabbed anyone at all. Hernandez's contention, in light of the evolving trend to allow an aider and abettor's mens rea to "float free" of the perpetrator's, requires a scrupulous analysis of the charges, the evidence, and the jury's findings to determine whether on this record the court committed reversible error.

Hernandez and Halford were jointly charged with Wentworth's murder and the attempted murder of Terrell.   And both were charged with the personal use of a deadly weapon within the meaning of Penal Code section 12022, subdivision (b)(1) in connection with the murder.  But the information alleged that only Halford personally used a deadly weapon in connection with the attempted murder.  The jury found Hernandez and Halford guilty of second degree murder and attempted murder, and the personal use allegations to be true.

The Attorney General argues that Hernandez, like his counterpart in *Samaniego*, forfeited his right to challenge the instruction on appeal by failing to request appropriate clarifying or amplifying language. The court wrote, "CALCRIM No. 400 is generally an accurate statement of law, though misleading in this case.  Samaniego was therefore obligated to request modification or clarification and, having failed to have done so, forfeited this contention." (*Samaniego, supra*, 172 Cal.App.4th at p. 1163.)

Hernandez insists that CALCRIM No. 400 is not generally correct because it subsumes the mens rea of a crime into the criminal act. But CALCRIM No. 400 should not be read alone.   While it provides an introduction to the general principles of aiding and

abetting, it is CALCRIM No. 401 that sets forth the elements for aiding and abetting and focuses on the defendant's personal mens rea. Thus, CALCRIM No. 401 provides: "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: [¶] 1. The perpetrator committed the crime; [¶] 2. The defendant knew that the perpetrator intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; [¶] and [¶] 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime. [¶]   Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime."

To the extent, as in *Samaniego* and *Nero*, CALCRIM No. 400 was misleading in this case, Hernandez should have asked for a clarification or modification.  His failure to do so constitutes a forfeiture of his claim on appeal.  Nevertheless, we conclude that on the record before us, if there was error in using the misleading phrase "equally guilty," and if Hernandez had not forfeited the right to challenge the misleading instruction, the error was harmless beyond a reasonable doubt. (*Samaniego, supra*, 172 Cal.App.4th at p. 1165.)

The evidence of Hernandez's participation in the murder and attempted murder are in sharp contrast to the evidence of the aider and abettor's involvement in *Nero, supra*, 181 Cal.App.4th 504, in which the court could not find beyond a reasonable doubt that the aider and abettor would have been found guilty of second degree murder in the absence of the instructional error.  The aider and abettor, Lisa Brown, was the perpetrator's older sister and had been his legal guardian since their mother died when he was 13 years old.  When Nero and Brown came out of a market, the victim was riding a bicycle in the parking lot. (*Id.* at pp. 507–508.)  The victim had ingested cocaine and ethyl alcohol within hours of his death.  According to *Nero*, the victim called his sister, who is a lesbian, a "bull dyke" and "bitch" and challenged him to a fight. (*Ibid.*)  The victim grabbed a knife from his bicycle and stabbed Nero's arm. (*Ibid.*)  Nero testified that when the victim dropped the knife, he picked it up and stabbed him in self-defense.  His sister kept trying to stop the fight. (*Id.* at pp. 508–509.)  According to the prosecutor, however, Brown handed her brother a knife. (*Id.* at p. 510.)

Thus, in *Nero*, Brown was guilty as an aider and abettor or not at all.  The jury specifically asked the court whether an aider and abettor could bear less responsibility than the perpetrator. (*Nero, supra*, 181 Cal.App.4th at pp. 511–512.)  The court reread the instruction that each principal is "equally guilty." (*Id.* at p. 512.)  The Court of Appeal concluded: "Notwithstanding that these instructions suggest that Brown's mental state was not tied to Nero's, the jury still asked if they could find Brown, as an aider and abettor, guilty of a greater or lesser offense than Nero.  This suggests to us that the aider and abettor instructions—namely, CALJIC No. 3.00—are confusing and should be modified. (fn.

omitted).  And where, as here, the jury asks the specific question whether an aider and abettor may be guilty of a lesser offense, the proper answer is 'yes,' she can be.  The trial court, however, by twice rereading CALJIC No. 3.00 in response to the jury's question, misinstructed the jury."  (*Nero*, at p. 518.)

Here there is no evidence that CALCRIM No. 400 confused the jury.  The record in *Nero* was crystal clear: the jurors struggled to understand the meaning of "equally guilty" when there was such a blatant disparity between the mens rea of the brother and that of his sister.  But unlike the jurors in *Nero*, here the jurors asked for no clarification of the meaning of the instruction.

Moreover, the facts before us bear little, if any, resemblance to the facts presented in *Nero*. In *Nero*, the fight was spontaneous; Nero did not even know the victim who initiated the confrontation, insulted his sister, and threatened him.  There was evidence Brown tried repeatedly to stop the fight.  Nero had not, as Halford had done here, announced an intention to harm or endanger the victim before getting involved in the altercation.  Even if the jury accepted the prosecution's theory that Brown handed her brother a knife in the heat of the moment, her participation hardly can be compared to Hernandez's robust involvement in the fight on the levee with Wentworth and Terrell.

Thus, the jury heard the compelling evidence that Hernandez knew before he left Hughes's house and accompanied Halford to the levee that Halford was hell bent on "deal[ing] with the mother fucker." Hernandez armed himself with two knives and a long stick.  He had observed Halford's violent threat to Tommy Duke when Halford held a knife to Duke's eye but benevolently refrained from stabbing him then because he had a young daughter.  On the levee, Hernandez was in Halford's presence when Halford announced his intention to kill Terrell.  Finally, and most importantly, Hernandez personally provided Halford one of the knives and proceeded to use the other one himself.

That is not to say that Hernandez's mens rea did not float free of Halford's.  As *McCoy* and its progeny have now made abundantly clear, there is a critical distinction between a perpetrator's criminal act, for which the aider and abettor may be equally responsible, and his mens rea, which the jury must assess independently.  But on this record, we have no reason to suspect that the jury did not follow its charge to determine whether Hernandez had knowledge of Halford's purpose and entertained the specific intent to aid and facilitate the murder of Wentworth and the attempted murder of Terrell.  Furthermore, the jury was properly instructed to "separately consider the evidence as it applies to each defendant" and "decide each charge for each defendant separately."

In this case, unlike *Nero*, there is substantial evidence that Hernandez was an active participant from start to finish.  Indeed, the jury found that he personally used a knife in connection with the murder.  Unlike *Nero*, we have no concern that the jury was confused by the phrase in CALCRIM No. 400 that an aider and

20

> abettor may be equally guilty with the perpetrator, expressing as it does that the act of one legally may be the act of all.  And the jury was otherwise properly instructed to carefully evaluate Hernandez's mental state, separate and apart from Halford.  As a result, we can conclude, as the court in *Nero* was unable to do, that any instructional error in CALCRIM No. 400 was harmless beyond a reasonable doubt.

*Halford*, 2013 WL 285580, at *9.

Assuming arguendo that this claim had not been procedurally defaulted, it should be denied on the merits.[3]  As set forth above, the California Court of Appeal held that any federal error in instructing petitioner's jury with CALCRIM No. 400 was harmless beyond a reasonable doubt, pursuant to *Chapman v. California*, 386 U.S. 18, 24 (1967).  Under AEDPA, a federal court may not overturn the state court decision unless that court applied *Chapman* "in an 'objectively unreasonable' manner."  *Mitchell v. Esparza*, 540 U.S. 12, 18 (2003).  *See also Mays v. Clark*, 807 F.3d 968, 980, (9th Cir. 2015) (a determination that an error resulted in prejudice under *Brecht* "necessarily means that the state court's harmlessness determination was not merely incorrect, but objectively unreasonable"); *Davis v. Ayala*, ___ U.S. ___, 135 S. Ct. 2187, 2198 (2015).  In other words, "a federal court may not award habeas relief under § 2254 unless *the harmlessness determination itself* was unreasonable."  *Fry v. Pliler*, 551 U.S. 112, 119 (2007) (emphasis in original).

The conclusion of the California Court of Appeal that any error in instructing petitioner's jury with CALCRIM No. 400 was harmless is not objectively unreasonable.  As explained by that court, there was substantial evidence that petitioner was equally responsible for the acts that were perpetrated at the homeless campground, and the jury instructions as a whole advised the jury that petitioner's mental state must be evaluated separately from Halford's mental state in determining whether he was guilty of the charged crimes.  Under these circumstances, it is reasonable to conclude that any error by the trial court in instructing the jury with CALCRIM NO. 400 could

---

[3]  Respondent appears to have waived any argument that this claim is subject to a procedural default.  *See* ECF No. 12 at 7 (admitting in answer that petitioner's claims do not appear to be procedurally defaulted).  *See also Francis v. Rison*, 894 F.2d 353, 355 (9th Cir. 1990) ("in state prisoner's habeas petitions, we have held that a state waives procedural default by failing to raise it in federal court").

1    not have had a substantial or injurious effect on the verdict in this case.  Accordingly, petitioner is

2    not entitled to habeas relief on this claim.[4]

3              **D. Jury Instruction on Adoptive Admissions**

4              In his final ground for relief, petitioner claims that the trial court violated his right to due

5    process in giving a jury instruction on adoptive admissions.  ECF No. 1 at 20.  The California

6    Court of Appeal agreed that the trial court erred in giving the instruction, but concluded that the

7    error was harmless.  The court reasoned as follows:

8              Hernandez also asserts it was error to give the jury an adoptive
              admission instruction when, as here, there is no evidence of any
9              accusation in Hernandez's presence calling for a denial.
              Specifically, he contends that testimony that Halford stated "I'm
10             going to kill you" in Hernandez's presence is not an adoptive
              admission under the hearsay exception set forth in Evidence Code
11             section 1221, and that accordingly, it was error to instruct on
              adoptive admissions.  We agree.
12
              Evidence Code section 1221 states: "Evidence of a statement
13             offered against a party is not made inadmissible by the hearsay
              rule if the statement is one of which the party, with knowledge of the
14             content thereof, has by words or other conduct manifested his
              adoption or his belief in its truth."
15
              "'If a person is accused of having committed a crime, under
16             circumstances which fairly afford him an opportunity to hear,
              understand, and to reply, and which do not lend themselves to an
17             inference that he was relying on the right of silence guaranteed by
              the Fifth Amendment to the United States Constitution, and he fails
18             to speak, or he makes an evasive or equivocal reply, both the
              accusatory statement and the fact of silence or equivocation may be
19             offered as an implied or adoptive admission of guilt.' [Citations.]"
              (*People v. Riel* (2000) 22 Cal.4th 1153, 1189.)  The trial court must
20             make a threshold determination whether the evidence is sufficient
              for a reasonable trier of fact to find a defendant adopted an
21             admission by his silence.  (*People v. Davis* (2005) 36 Cal.4th 510,
              535.)
22
              We conclude there was not sufficient evidence to support a finding
23             that Hernandez adopted Halford's incriminating statement by
              remaining silent.  Halford's statement, "I'm going to kill you" was
24             not "an accusation" that Hernandez would be expected to respond

25

26    ───────────────────────
              [4]   In the petition, petitioner claims that his trial counsel rendered ineffective assistance in
27    failing to challenge CALCRIM No. 400, to the extent that this failure may have forfeited a
      challenge to this jury instruction on appeal.  ECF No. 1 at 19.  Petitioner agrees that this claim is
      now moot.  ECF No. 18 at 17.  Accordingly, the court will not address petitioner's claim of
28    ineffective assistance of trial counsel.

                                                    22

to or to deny.  Rather, the statement merely reflected Halford's subjective intent at the time.  Thus, there was no evidentiary basis to support the instruction and it was error to do so.

Nevertheless, the error was harmless.  The jury found that Hernandez personally used a knife in killing Wentworth.  Given the overwhelming evidence that he was armed with two knives, carried a stick, and engaged in the fight, the fact that he stood mute in the face of his codefendant's threat would have had minimal, if any, impact on the jury.  Nor was his claim of self-defense derailed by the possibility that the jury came to the erroneous conclusion, pursuant to this instruction, that he admitted guilt by failing to deny Halford's statement of intent.  Based on the record before us, we conclude the adoptive admission instruction did not result in a miscarriage of justice because we can say, beyond a reasonable doubt, that Hernandez would have been found guilty of the charged offenses in the absence of the error.

*Halford*, 2013 WL 285580, at *11.

As in the claim above, the state court's determination that any error in giving a jury instruction on adoptive admissions was harmless is not objectively unreasonable.  There is no reasonable possibility the result of the proceedings would have been different if the jury instruction on adoptive admissions had not been given.  As the state court concluded, the acts committed by petitioner weighed far more heavily in terms of his conviction than the fact that he did not object to Halford's threat to kill Terrell.  Accordingly, petitioner is not entitled to relief on this claim.

**IV. Conclusion**

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir.

23

1   1991).  In his objections petitioner may address whether a certificate of appealability should issue

2   in the event he files an appeal of the judgment in this case.  *See* Rule 11, Rules Governing Section

3   2254 Cases (the district court must issue or deny a certificate of appealability when it enters a

4   final order adverse to the applicant).

5   DATED:  October 11, 2016.

6   EDMUND F. BRENNAN
    UNITED STATES MAGISTRATE JUDGE